UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
JAMES A. JOHNSON, JR.,             : 09 Civ. 6017 (RMB) (JCF)
                                   :
                                   :      REPORT AND
            Plaintiff,             :      RECOMMENDATION
                                   :
    - against -                    :
                                   :
MICHAEL J. ASTRUE,                 :
Commissioner of Social Security,   :
                                   :
            Defendant.             :
- - - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

    The plaintiff in this action, James A. Johnson, Jr., seeks review under 42 U.S.C. § 405(g) of a determination by the Commissioner of Social Security ("the Commissioner") denying his application for disability insurance benefits.  Both parties have moved for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons set forth below, I recommend that Mr. Johnson's motion be denied and the Commissioner's motion be granted.

Background

    A. Personal History

    Mr. Johnson was born on December 2, 1973.  (A. at 389).[1]  He completed high school and one year of college, where he studied business management.  (A. at 390-91).  Prior to the onset of his alleged disability, the plaintiff was self-employed as a carpenter. He had previously worked as a maintenance man and as a night

_____

    [1] "A." refers to the administrative record filed with the Commissioner's answer.

houseman.[2]  (A. at 391-96).  Mr. Johnson is married and lives in a single-level trailer in rural New York with his wife and their three young children.  (A. at 387).

At the time of his accident, Mr. Johnson had been self-employed for five years,[3] operating a residential remodeling and construction business with his wife out of their home.  (A. at 391-92).  As of May 8, 2008, his wife continued to run their business, hiring laborers to perform work previously done by the plaintiff. (A. at 392-93).  Although Mr. Johnson claims not to have worked since his injury, he did report $20,088 in income on his 2006 income tax return.  (A. at 27, 53, 56, 388-89).  He asserts that this sum was actually earned by his wife and was erroneously attributed to him on their joint tax return.  (A. at 388-89).  His accountant submitted a letter reflecting her intention to amend Mr. Johnson's 2006 tax return to report no income, although the record does not indicate whether she actually did so. (A. at 27, 423-24).

   B.  Medical History

      1.  Disability

Mr. Johnson claims that his disability results from a combination of four factors: nerve damage and weakness in his left leg due to an on-the-job injury, lower back pain as a consequence of herniated disks, depression, and obesity.  (Complaint ("Compl."), ¶¶ 10-10(a); Plaintiff's Brief in Support of Motion for

---

[2] A night houseman is a type of hotel worker who works the night shift and provides room services to guests.

[3] The record is ambiguous as to how long Mr. Johnson had been self-employed.  (A. at 83 (three years), 94 (five years)).

Judgment on the Pleadings ("Pl. Memo.") at 13-16; Plaintiff's Reply Brief in Support of Motion for Judgment on the Pleadings ("Pl. Reply Memo.") at 2-9).   I will discuss each of these issues individually.

a. Leg Injury

Mr. Johnson asserts that he became disabled on July 18, 2005, when, while working, he fell off a roof and received a deep cut to his left lower thigh from a circular "skil-saw." (A. at 115, 120). His wound was fifteen centimeters long and four centimeters wide, almost reached his femur bone, and narrowly missed his femoral artery. (A. at 120, 122-23). Mr. Johnson's wife drove him to the Catskill Regional Medical Center, where he received emergency treatment for his injury. (A. at 113-26). Dr. Abdul R. Shahzad performed a surgical repair of Mr. Johnson's thigh, which included exploration and primary repair for a deep wound and a sharp debridement of the skin. (A. at 122).

Following his emergency room visit, Mr. Johnson received treatment from Dr. Barry Scheinfeld and Nurse Practitioner Norma O'Brien at Catskill Rehabilitation/Sports Medicine ("CRSM"). The plaintiff went to CRSM on a monthly basis for over three years, from July of 2005 through August of 2008, with occasional breaks. (A. at 138-39, 146, 158, 150, 162, 166-67, 181-83, 230, 244, 246, 248, 252, 254, 256, 258, 260, 283-84, 287-88, 294-95, 300-05, 311-12, 319-20). He consistently reported pain in his left thigh, accompanied by numbness and tingling, some diminished strength, and decreased sensitivity to touch. (A. at 138-39, 146, 158, 160, 162,

166-67, 181-83, 230, 244, 246, 248, 252, 254, 256, 258, 260, 283-84, 287-88, 294-95, 300-05, 311-12, 319-20).   On numerous occasions, Dr. Scheinfeld noted atrophy of Mr. Johnson's thigh muscle inferior to his scar.  (A. at 139, 146, 158, 160, 162, 166, 230, 244, 246, 248, 252,  254, 256, 258, 260, 284, 288, 295, 301, 303, 305, 312, 320).  A "nerve test" administered in late 2006 revealed permanent nerve damage to Mr. Johnson's leg.  (A. at 254). Throughout this period of treatment, the diagnosis given Mr. Johnson by CRSM staff was "Lesion Femoral Nerve Other,"[4] often accompanied by "meralgia paresthetica."[5]  (A. at 139, 146-47, 159, 161, 163, 167, 182-83, 231, 245, 247, 249, 253, 255, 257, 259, 261, 284, 288, 295, 301, 303, 305, 312, 320).

Notwithstanding these complaints, CRSM staff consistently found Mr. Johnson to have a normal gait, full range of motion in his musculoskeletal system, an absence of muscle spasms in his spine or legs, and intact reflexes.  (A. at 138-39, 146-47, 158-63, 166-67, 181-83, 230, 244, 246, 248, 252, 254, 256, 258, 260, 283-84, 287-88, 294-95, 300-05, 311-12, 319-20).  In addition, he maintained full strength in all but his left quadricep, where his strength was rated "4" out of a maximum "5," and he continually passed motor system, reflex, and gait and station tests to determine functionality.  (A. at 138-39, 146-47, 158-63, 166-67,

---

[4] The femoral nerve supplies the thigh muscles.  Dorland's Illustrated Medical Dictionary 615 (28th ed. 1994).

[5] Dorland's Medical Dictionary defines meralgia paresthetica as "a disease marked by . . . pain and numbness in the outer surface of the thigh, in the region supplied by the lateral femoral cutaneous nerve. . . ."  Id. at 1014.

181-83, 230, 244, 246, 248, 252, 254, 256, 258, 260, 283-84, 287-88, 294-95, 300-05, 311-12, 319-20).

Dr. Scheinfeld repeatedly prescribed physical therapy to alleviate Mr. Johnson's symptoms by strengthening his leg and its surrounding muscles. (A. at 139, 161, 163, 167, 183, 231, 245, 247, 249, 253, 288, 295, 301, 320). As a result, the plaintiff attended half-hour physical therapy sessions multiple times each week from August 2005 through September 2005, and again from December 2005 through February 2006 and May 2006 through July 2006. (A. at 185-201, 204-11, 220-21, 224-29, 232-43). Mr. Johnson was also prescribed pain medications, including Vicodin and Lidoderm, and was given a knee brace in October 2006. (A. at 183, 231, 251, 253, 258, 260-61, 288, 309, 311). He experienced a steady improvement in his condition, stating in January and February of 2006 that he felt he was "getting better," that his "pain [was] less," and that he had "less pain . . . since starting therapy." (A. at 206, 210, 211). Although Mr. Johnson's condition had deteriorated somewhat by the time he re-entered physical therapy in May of 2006, he again reported improvement by the end of that series of treatments, stating that he was "not doing so bad," and consistently reporting no "new complaints." (A. at 232, 234, 238, 240, 242). Mr. Johnson discontinued his physical therapy sessions entirely by the summer of 2006 because he no longer wished to continue paying a co-pay for each visit, especially in light of the fact that he owed CRSM "a few thousand dollars" and thought he could "do the same thing at home." (A. at 399-400). Mr. Johnson

described his home regimen as "just basically stretches." (A. at 403).

        b.  <u>Back Pain</u>

Mr. Johnson first reported pain in his lower back during his first two visits to CRSM in July and November of 2005. (A. at 138, 181). He did not mention it again until his May 12, 2006 appointment, when he told Ms. O'Brien that his lower back was hurting. (A. at 166). She prescribed physical therapy and ordered an x-ray of his lumbar spine, which indicated progressive degenerative discogenic changes at the L4-L5 and L5-S1 levels as compared to an October 2001 x-ray, along with loss of lumbar lordosis.[6] (A. at 136, 167). In his two subsequent physical therapy sessions, Mr. Johnson told the physical therapist that his pain had been "severe" but was by that point "a little better" and that he "occasionally gets low back pain which interferes with his exercise." (A. at 226, 228). At the following visit with Ms. O'Brien, on June 9, 2006, the plaintiff noted no back pain at all; however, Ms. O'Brien still gave a diagnosis of "Intervertebral Disc Displacement Lumbar W/O Myelopathy." (A. at 230-31). Neurological and motor examinations were normal, as were Mr. Johnson's gait and reflexes, and he had a full range of motion in his spine. (A. at 230).

There were no further reports of back pain until February

---

[6] "[L]umbar lordosis is a secondary curvature of the vertebral column, acquired postnatally as the upright posture is assumed when one learns to walk." <u>Stedman's Medical Dictionary</u> 232, 450 (27th ed. 2000). Loss of lumbar lordosis occurs when the curve in the lower back has flattened.

2008, roughly two and one-half years after the accident, when Mr. Johnson began to report more severe and persistent back pain that began after he slipped on ice. (A. at 300). On February 27, 2008, Mr. Johnson's back pain was apparently so bad that Dr. Scheinfeld reported, for the first and only time, that he considered the plaintiff to be disabled, due to the exacerbation of his old spinal injury combined with nerve damage from the saw accident. (A. at 301). However, Mr. Johnson also reported at the same visit that he was actively trying to find work as a "light duty carpenter" and that he was completing a home exercise regimen four times a week. (A. at 300). For the first time since June 2006, he was again given a diagnosis of "Intervertebral Disc Displacement Lumbar W/O Myelopathy." (A. at 301).

At his next visit, on March 20, 2008, Mr. Johnson reported no back pain, was given no diagnosis relating to his back, and was not found to be disabled. (A. at 294-95). His reports of back pain and the diagnosis of "Intervertebral Disc Displacement Lumbar W/O Myelopathy" returned at his subsequent visit on April 14, 2008, and an MRI performed on his back on May 9, 2008, revealed "disc herniation at L5-S1 contacting and deforming the ventral portion of the thecal sac," which was "inseparable from the left S-1 nerve root within the canal," as well as "mild diffuse bulging" at L4-L5. (A. at 288, 307). However, "no evidence of spinal canal stenosis" was identified, and the remaining nerve roots were "unremarkable." (A. at 307). When Mr. Johnson's back pain continued into May, Dr. Scheinfeld recommended that he see a neurosurgeon, Dr. Jeffrey

Oppenheim, which he subsequently did.  Dr. Oppenheim reported that Mr. Johnson presented "with symptoms of left S1 radiculopathy" but found that he was "relatively intact from a neurological standpoint" and recommended "conservative therapy," including epidural steroid injections to manage his pain.  (A. at 321-22).

Despite continuing to report back pain into August 2008, Mr. Johnson declined the recommended steroid injections.  (A. at 320). However, in February of 2008, Dr. Scheinfeld referred him for another four to six weeks of physical therapy in order to ameliorate his back pain.  (A. at 301).  At these sessions, Mr. Johnson completed stretching and therapeutic exercises and received traction and moist heat therapy.  (A. at 285-86, 289-93, 296-99). He described his back pain as intermittent and stated that it originated in a then five-year-old accident where he "flipped over [a] rosebush."  (A. at 285-86, 289-93, 296-99).  The records from these sessions note significant improvements in his back pain by April of 2008; Mr. Johnson stated that his condition was "much better."  (A. at 285, 289).  At a single session in June of 2008, the plaintiff reported that his pain was "2-3" on a scale of 10, although the pain increased to "6-7" if he sat for a long time. (A. at 317).

c. Depression

When he initially presented at CRSM in July of 2005, Mr. Johnson denied experiencing depression or anxiety, and Dr. Scheinfeld found in November 2005 that his mental status was "alert and fully oriented."  (A. at 138-39, 182).  Mr. Johnson's medical

8

records note for the first time on March 24, 2006 that he was depressed due to his diminished ability to function and its impact on his family. (A. at 160-61). Ms. O'Brien listed "depression" as a medical problem in her report for that date and requested authorization for psychological or psychiatric care. (A. at 161). On April 26, 2006, Ms. O'Brien again recommended psychiatric treatment, and both she and Dr. Scheinfeld continued to list "depression" on the record for the duration of Mr. Johnson's treatment at CRSM. (A. at 162, 166, 230, 244, 246, 248, 252, 254, 256, 258, 260, 283, 287, 294, 300, 302, 304, 311, 319). Mr. Johnson began taking Cymbalta for this condition in December of 2007 and continued taking it through the period of his treatment at CRSM. (A. at 283, 287, 294, 300, 302, 304, 311, 319). He reported some improvement as a result of this treatment, stating that "it helps." (A. at 431).

On August 22, 2008, Dr. P. Pazarino of Synergy of Monticello performed an initial evaluation of Mr. Johnson.[7] (A. at 352-54). The plaintiff described himself as depressed, anxious, and "feeling out of control." (A. at 352). Mr. Johnson also reported that he was a chronic marijuana user. (A. at 352). Dr. Pazarino described Mr. Johnson's appearance and behavior as "appropriate" and diagnosed him with "major depressive disorder, single episode, severe," due to "family dysfunction and financial [concerns]." (A. at 353-54). He recommended psychopharmacological and therapeutic

---

[7] The handwriting on the reports from "Synergy of Monticello" is difficult and, in places, nearly impossible to decipher.

treatments and later prescribed Xanax for Mr. Johnson's anxiety.
(A. at 354, 351).  At a follow-up visit on August 28, 2008, Mr.
Johnson was reported to have had a "good response" to the
medication, with improved sleep, although he was still "anxious and
depressed."  (A. at 351).  At three subsequent visits with a
clinical social worker at Synergy -- on September 3, 10, and 17 --
the plaintiff reported that he was taking his medications without
side effects but that he was still experiencing anxiety,
depression, and difficulties with his wife due to his physical
ailments and inability to work.  (A. at 348-50).  The social worker
reported that Mr. Johnson's appearance and behavior were
"appropriate," his eye contact, orientation, concentration were
"fair," and his thought content "unremarkable," although his
functioning with work, family and peers was "negative."  (A. at
350).  The plaintiff's long term goal was to "[c]ontrol anxiety,"
and his short term goal was to "[c]ontrol depression."  (A. at
350).

d. Obesity

Mr. Johnson states that his "regular working weight" prior to
his accident was 200 to 205 pounds.  (A. at 389, 421).  However,
when he first presented at CRSM only eight days after his accident,
his weight was 215 pounds.  (A. at 182).  His weight rose to 222
pounds by March 24, 2006, and hovered around 220 pounds through at
least March 2, 2007, when he stopped going to CRSM.  (A. at 160,
162, 166, 230, 244, 246, 248, 252, 254, 256, 258, 260).  When the
plaintiff next returned to CRSM on December 19, 2007, his weight

had increased to 230 pounds, where it stayed, according to CRSM's reports, through August 2008.  (A. at 283, 287, 294, 300, 302, 304, 311, 319).

However, there are discrepancies in the record regarding Mr. Johnson's weight.  At his first hearing on May 8, 2008, Mr. Johnson reported that his weight was 235 pounds  (A. at 389), and Dr. Oppenheim found him to be the same weight a month later.  (A. at 321).  In contrast, in an evaluation performed by Dr. Justin Fernando on May 14, 2008, he listed the plaintiff's weight as 246 pounds, which was the same weight Mr. Johnson reported at his second hearing on September 30, 2008.  (A. at 337, 421).  Dr. Fernando also reported Mr. Johnson's height as 5'5", which is shorter than both CRSM's and Dr. Oppenheim's measurements as well as Mr. Johnson's own testimony.  (A. at 138, 158, 160, 162, 166, 182, 244, 246, 248, 252, 254, 256, 258, 260, 283, 287, 294, 300, 302, 304, 311, 319, 321, 337, 389).  During this entire period -- from April through August of 2008 -- CRSM's records indicate that Mr. Johnson's weight was holding steady at 230 pounds.  (A. at 283, 287, 311, 319).

With respect to the impact of his obesity on his alleged disability, Mr. Johnson testified that his size keeps him from being able to touch his feet and thus he is unable to clean his feet or put on his own socks and shoes.  (A. at 403).  He also testified that the additional weight causes him lower back pain. (A. at 424).

2. <u>Functional Capacity</u>

On May 14, 2007, Dr. Scheinfeld completed a statement about Mr. Johnson's functional capacity. (A. at 267-70). Dr. Scheinfeld stated that Mr. Johnson could occasionally lift and carry up to twenty pounds and that he could stand less than two hours during an eight hour workday, but that sitting was not affected by his impairment. (A. at 267-68). He also stated that Mr. Johnson was limited in "pushing" and "pulling" with his right leg[8] because of weakness from femoral neuropathy, as revealed by the EMG tests, and that he could never climb, balance, kneel, crouch, crawl, or stoop, but that he had no manipulative limitations. (A. at 268-69). Dr. Scheinfeld felt that Mr. Johnson's visual and communicative functions were unimpaired but that he should work in an environment free from hazards such as "machinery" and "heights." (A. at 270).

On May 14, 2008, Dr. Fernando performed an orthopedic examination on the plaintiff at the request of the Social Security Administration, Division of Disability. (A. at 336). His report of Mr. Johnson's accident contained a new element -- that it was precipitated by a loss of consciousness. (A. at 336). With respect to his current symptoms, Mr. Johnson complained of pain in his left thigh, numbness around his scar, and radiating pain caused by herniated discs in his lower back. (A. at 336). Dr. Fernando's examination found that the plaintiff had normal gait and station,

---

[8]  Dr. Scheinfeld apparently mistakenly identified Mr. Johnson's affected leg as the right leg in the May, 14, 2007 report, later submitting a corrected report on May 16, 2007, indicating that it was, in fact, Mr. Johnson's left leg which had been injured.

that he could walk without difficulty, needed no assistive devices, was able to perform a full squat, and rose from a chair without difficulty.  (A. at 338).  Mr. Johnson had a full range of motion and full strength in his upper extremities and lower back.  (A. at 338).  Dr. Fernando also found that Mr. Johnson had full strength in his lower extremities with a full range of motion in his hips, knees, and ankles, and noted that Mr. Johnson had no instability in his legs.  (A. at 338).  In addition, Dr. Fernando observed that Mr. Johnson had no difficulty getting on and off of the examination table and did not require any assistance in removing his clothes for the examination or dressing afterwards.  (A. at 338).  Consistent with the balance of the medical history, Dr. Fernando found that Mr. Johnson had a sensory abnormality over the anterior aspect of his left thigh around the saw injury scar.  (A. at 338).

Dr. Fernando's diagnosis was that the plaintiff had suffered from a laceration of his anterior left thigh and that he had a history of herniated and bulging discs in his lower back accompanied by obesity.  (A. at 338-39).  Dr. Fernando's opinion was that Mr. Johnson's prognosis was "good and even excellent," and that there was no evidence of any neurological, motor, or sensory deficit except for surface numbness around the injury scar.  (A. at 339).  In fact, Dr. Fernando found, "[t]he injury itself has caused no significant limitation of function."  (A. at 339).

Based on this examination, Dr. Fernando completed a statement regarding Mr. Johnson's ability to perform work-related activities. (A. at 340-46).  He stated that the plaintiff could continuously

lift and carry objects weighing up to 100 pounds and that he could sit for eight hours and stand or walk for four hours a day without interruption.  (A. at 340-41).  Dr. Fernando also reported that he thought Mr. Johnson could use his hands and feet continuously, operate foot controls, and continuously stoop, kneel, crouch and crawl, but that he should not climb stairs, ramps, ladders, or scaffolds, balance, operate a motor vehicle, or be exposed to unprotected heights or moving mechanical parts.  (A. at 342-44). Dr. Fernando reported that it was his opinion that the plaintiff could perform all of the items on a list of common activities, including shopping, traveling without a companion, ambulating without an aide, walking a block at a reasonable pace on rough or uneven surfaces, using standard public transportation, climbing a few steps at a reasonable pace using a handrail, preparing simple meals, feeding himself, caring for personal hygiene, and handling papers.  (A. at 345).

On October 6, 2008, Dr. Scheinfeld prepared another statement on Mr. Johnson's functional capacity.  (A. at 356-59).  He increased the weight that he thought Mr. Johnson could occasionally lift and carry to twenty-five pounds from twenty pounds and added that he believed Mr. Johnson could frequently lift and carry up to ten pounds.  (A. at 356).  He also increased the amount of time that Mr. Johnson could stand or walk from less than two hours to "at least two hours" in a work day and maintained that there was no restriction on his ability to sit.  (A. at 356-57).  However, he again found that the plaintiff's ability to push and pull was

14

limited in his lower extremities due to nerve damage and that Mr. Johnson could never climb, balance, kneel, crouch, crawl, or stoop because of his femoral neuropathy.  (A. at 357).  Finally, he stated that although Mr. Johnson's visual and communicative functions were unimpaired, he should work in an environment free from vibration and hazards such as "machinery" and "heights."  (A. at 358-59).

### C. Prior Proceedings

#### 1. Legal Standard

A claimant is disabled under the Social Security Act and therefore entitled to benefits if he can demonstrate that he has acquired sufficient quarters of coverage and is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The disability must be of "such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

To determine whether an individual is entitled to disability benefits, the presiding Administrative Law Judge ("ALJ") employs a five-step sequential analysis.  20 C.F.R. § 404.1520; Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 1999).  First, a claimant must demonstrate that he is not currently engaged in "substantial

gainful activity." 20 C.F.R. § 404.1520(b).  Next, a claimant must prove that he has a severe impairment which "significantly limits [his] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the impairment is listed in the appendix to the Commissioner's regulations, or is the substantial equivalent of a listed impairment, the claimant is automatically considered disabled.  20 C.F.R. § 404.1520(d).  However, if the claimant's impairment is neither listed nor equal to any listed impairment, he must prove that he does not have the residual functional capacity to perform his past work.  20 C.F.R. § 404.1520(e).[9]  Finally, if the claimant satisfies his burden of proof on the first four steps, the burden shifts to the ALJ to show that there is alternative substantial gainful employment in the national economy that the claimant can perform.  20 C.F.R. § 404.1520(g); Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000).  At each stage of his evaluation, the ALJ must explain his analysis and address all pertinent evidence. See Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).

Ordinarily, the ALJ meets her burden at the fifth step by resorting to the applicable medical-vocational guidelines ("the grids"), which take into account a claimant's residual functional capacity, age, education, and work experience.  20 C.F.R. pt. 404,

---

[9] Residual functional capacity is "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).  It is the most a claimant can still do despite his or her limitations. See 20 C.F.R. § 416.945(a)(1).  Residual functional capacity is considered during steps four and five of the sequential analysis. 20 C.F.R. § 416.945(a)(5).

subpt. P, app. 2.   Based on these considerations, the grids indicate whether the claimant can engage in any substantial gainful work existing in the national economy.   Jobs are classified by exertional levels based on the strength demands of the position, increasing incrementally from sedentary light to medium, heavy, and very heavy work.   20 C.F.R. § 404.1567.   Strength demands include the abilities to sit, stand, walk, lift, carry, push, and pull.   20 C.F.R. § 404.1569a(b).   An ALJ considers impairments listed in the Appendix when determining exertional levels.   20 C.F.R. § 404.1569a(b).   Listed physical impairments include disorders of the musculoskeletal system causing joint pain, limited range of motion, or stiffness, resulting from an "inflammatory or degenerative process." 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00. However, musculoskeletal impairments also include major dysfunctions of a weight-bearing joint that result in an "inability to ambulate effectively."   20 C.F.R. pt. 404, subt. P, app. 1 § 1.02(A).

Although the grid results are generally dispositive, the ALJ should consider the impact of significant nonexertional limitations if they limit the range of sedentary work a claimant can do.   See Rosa v. Callahan, 168 F.3d 72, 82 (2d Cir. 1999).   Nonexertional limitations are those limitations or restrictions that may affect a claimant's ability to meet the non-strength related demands of a job.   20 C.F.R. § 404.1569a(c).   They include pain, difficulty functioning due to anxiety or depression, difficulty maintaining attention or concentration, and difficulty tolerating physical

features of a work setting such as dust or fumes.   20 C.F.R. §
404.1569a(c)(1).  Nonexertional limitations also include "Affective
Disorders," which are "[c]haracterized by a disturbance of mood"
and accompanied by a depressive or manic disorder. 20 C.F.R. pt.
404, subpt. P, app. 1 § 12.04.   There are two possible avenues to
meet the required level of severity for a depressive disorder.
First, there may be "[m]edically documented persistence, either
continuous or intermittent," of "a depressive syndrome" accompanied
by at least four of the following characteristics: sleep
disturbance, decreased energy, feelings of worthlessness or guilt,
difficulties   thinking   or   concentrating,   suicidal   thoughts,
delusions, hallucinations, or paranoid thinking.   20 C.F.R. pt.
404, subpt. P, app. 1 § 12.04(A)(1).   In addition, there must also
be a showing of at least two of the following: (1) "[m]arked
restriction of activities of daily living; or (2) [m]arked
difficulties in maintaining social functioning; or (3) [m]arked
difficulties in maintaining concentration, persistence or pace;" or
(4) [r]epeated episodes of [extended] decompensation."   20 C.F.R.
pt. 404, subpt. P, app. 1 § 12.04(B).   The alternative method of
showing an affective disorder requires a "[m]edically documented
history of a chronic affective disorder of at least 2 years'
duration that has caused more than a minimal limitation of ability
to do basic work activities, with symptoms or signs currently
attenuated by medication or psychosocial support," in addition to
one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. pt. 440, subpt. P, app. 1 § 12.04(C).

   2. <u>Proceedings</u>

Mr. Johnson filed for disability benefits within a few weeks of his saw accident, on August 2, 2005. (A. at 12, 33). He explained that he did not file for workers' compensation insurance because, as a self-employed individual, he had not paid for coverage. (A. at 414). The plaintiff's initial application indicated that his disability was caused by his leg injury alone; however, he now argues that his disability arises from the combination of his leg and back injuries, his depression, and his obesity. (A. at 59; Compl., ¶¶ 10-10(a); Pl. Memo. at 13-16; Pl. Reply Memo. at 2-9). Mr. Johnson's application for disability benefits was denied on March 10, 2006. (A. at 33). He subsequently requested a hearing before an ALJ. (A. at 45).

On May 8, 2007, ALJ Katherine Edgell held a hearing, and on June 18, 2007, she issued a decision finding that Mr. Johnson was not disabled according to Social Security Regulations. (A. at 22-31, 40, 384-416). Mr. Johnson requested a review of ALJ Edgell's decision on August 22, 2007, and on February 11, 2008, the Appeals

19

Council remanded Mr. Johnson's case back to ALJ Edgell in order (1) to resolve inconsistencies between Mr. Johnson's medical history and Dr. Scheinfeld's May 14, 2007 functional assessment report to ensure compliance with the "treating source" rule, 20 C.F.R. § 404.1527, and (2) for further clarification of Mr. Johnson's residual functional capacity under 20 C.F.R. § 404.1512. (A. at 19-21, 32). Thereafter, ALJ Edgell asked Dr. Scheinfeld to clarify how he had arrived at his conclusions about Mr. Johnson's level of ability in his May 14, 2007 statement. (A. at 277). In response, Dr. Scheinfeld eventually submitted the October 6, 2008 report discussed above.

On September 30, 2008, ALJ Edgell held a supplemental video hearing, and on October 27, 2008, she issued a decision again finding that Mr. Johnson was not disabled. (A. at 9-18, 35-39, 419-43). In her opinion, the ALJ first noted that the plaintiff had acquired sufficient quarters of coverage and thus was eligible for disability insurance. (A. at 12, 14). Next, ALJ Edgell addressed the fact that Mr. Johnson had reported earnings of $20,088 following the onset of his alleged disability. (A. at 14). Although as a threshold matter this income should have disqualified Mr. Johnson from receiving disability benefits, the ALJ accepted as true Mr. Johnson's contention that this income was actually earned by his wife, since no earnings had been posted to his record. (A. at 14).

At step two, ALJ Edgell determined that Mr. Johnson's left leg injury and spinal condition constituted severe limitations. (A. at

15).  Despite finding the plaintiff was severely impaired, the ALJ concluded that his depression could not be considered disabling because it did not result in any significant limitations or treatment prior to August 2008, and because later treatment notes indicated that Mr. Johnson's symptoms were being managed by medication and that his depression had diminished.[10]  (A. at 15). Therefore, the ALJ found that Mr. Johnson's mental condition could not be considered disabling because it had not been sufficiently severe and because it had not lasted and could not be expected to last for a continuous twelve-month period.  (A. at 15).  ALJ Edgell did not consider Mr. Johnson's obesity as an independent factor in her determination of whether he was severely impaired under the regulations.  (A. at 14-15).

At step three, the ALJ determined that Mr. Johnson's impairments, or combination thereof, did not meet or equal an established disability as set forth in the grids.  (A. at 15).  She noted that specific medical findings must be present in a claimant's record in order to find that a combination of impairments meets a listed impairment and that such findings were not contained in the plaintiff's medical file.  (A. at 15).

At step four, ALJ Edgell found that Mr. Johnson had residual functional capacity to perform the "full range of light work as defined in 20 C.F.R. 404.1567(b)."  (A. at 15).  She based her

---

[10] The ALJ's findings here are factually incorrect in that she overstates the ameliorative effect of treatment for Mr. Johnson's depression, as well as its duration.  However, as discussed below, these misstatements do not undermine her conclusion.

decision on her determination that "the findings reflected in the record tend to suggest the claimant has a lesser degree of symptoms and a higher level of functioning than contended" and that, in her analysis under 20 C.F.R. § 404.1529 and Social Security Rulings ("SSRs") 96-4p and 96-7p, Mr. Johnson's complaints were "not credible." (A. at 15). The ALJ arrived at her conclusion about the plaintiff's residual functional capacity and credibility based on his statements about his condition and abilities, portions of Dr. Scheinfeld's and Dr. Fernando's functional assessment reports and physician visit records, and the results of medical tests. (A. at 15-17).

In assessing Mr. Johnson's residual functioning capacity, ALJ Edgell found particularly persuasive the plaintiff's own accounts of his abilities to perform activities of daily living.[11] (A. at 16). In addition, she noted his apparent lack of difficulty climbing onto the examining table or rising from a seated position

_____

[11] ALJ Edgell cited Mr. Johnson's accounts of

> attend[ing] his children's activities or family functions in NYC, which would require him to travel at least one hour by car . . . regularly [riding] a stationary bike for exercise, play[ing] with his daughter, who was then only three years old, car[ing] for his other children after school, dr[iving] his car, including regularly driving to his physical therapy sessions, working on his computer and attending church once per week.

(A. at 16.). There are numerous misstatements in these findings. In fact, Mr. Johnson testified that he only sometimes drove a car short distances, that his wife regularly drove him to physical therapy sessions, and that he was attending church once a month or less. (A. at 401, 404, 422, 434, 436). However, as discussed below, these misstatements do not provide sufficient cause for reversing the ALJ's decision.

during his visit with Dr. Fernando.  (A. at 16).  ALJ Edgell concluded that Mr. Johnson's presentation to Dr. Fernando that he regularly participated in cleaning, shopping, and childcare weighed against finding him disabled, as did the fact that he repeatedly and consistently demonstrated a normal gait and full range of motion and an absence of muscles spasm in his spine, even when he complained of back pain.  (A. at 16-17).  The ALJ also found that the results of Mr. Johnson's medical tests showed he was minimally affected by his femoral neuropathy and disc degeneration and herniation.  (A. at 16).  Finally, she noted that Mr. Johnson himself had reported improvement in his back and leg conditions, except for the persistent weakness and numbness in his left thigh and around the scar from his saw injury, and that he never sought emergency room or hospital care for his pain.  (A. at 16).

ALJ Edgell did not address Dr. Oppenheim's findings,[12] although she did explain how she reconciled the contradictory content of the opinions of Dr. Scheinfeld and Dr. Fernando.  (A. at 17).  She noted that Dr. Scheinfeld's functional assessments were sometimes incompatible with the findings in his treatment notes, and thus she only considered the functional assessments that were consistent. (A. at 17).  In addition, the ALJ discounted Dr. Fernando's functional assessment where it did not align with his own accounts and the bulk of the medical record.  (A. at 17).

---

[12] It would seem to be to Mr. Johnson's benefit that the ALJ did not consider Dr. Oppenheim's assessment of his condition, because Dr. Oppenheim opined that the plaintiff was not seriously affected by his neurological deficits and recommended only "conservative" treatment.

After finding that Mr. Johnson still had the residual capacity to engage in light work, ALJ Edgell moved on to step five of the analysis, which required a determination whether there was alternative substantial gainful employment in the national economy that Mr. Johnson could perform. (A. at 17-18). First, she found that the plaintiff was unable to perform any of his past jobs because all of his previous employment involved heavy lifting, which he could no longer do. (A. at 17). Next, she determined based on the grids that there were jobs in the national economy that Mr. Johnson could perform and that they existed in sufficient quantity. (A. at 18). Thus, ALJ Edgell determined that Mr. Johnson was "not disabled" and denied his application for benefits. (A. at 18). Mr. Johnson sought review of this decision, but his application was denied by the Appeals Council on May 17, 2009, and ALJ Edgell's decision thus became the final determination of the Commissioner. (A. at 5-7). Mr. Johnson then filed the instant action.

Discussion

A. Standard of Review

A federal court reviewing a denial of disability insurance benefits may set aside the Commissioner's decision when it is not supported by substantial evidence or is based on legal error. See 42 U.S.C. § 405(g); Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003); Hahn v. Astrue, No. 08 Civ. 4261, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009). Judicial review, therefore, involves two levels of inquiry. First, the court must decide whether the

Commissioner applied the correct legal standard. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254, 2008 WL 4452359, at *8 (S.D.N.Y. April 29, 2008), report and recommendation adopted by 2008 WL 4449357 (S.D.N.Y. Oct. 1, 2008). Second, the court must determine whether the decision was supported by substantial evidence. Tejada, 167 F.3d at 773.

Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Longbardi v. Astrue, No. 07 Civ. 5952, 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009); see also Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam). Further, "'the crucial factors in any [ALJ's] determination must be set forth with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence.'" Longbardi, 2009 WL 50140, at *21 (second alteration in original) (quoting Ferraris, 728 F.2d at 587). Courts must be mindful of the fact that the Social Security Act "'is a remedial statute which must be liberally applied.'" Vargas v. Sullivan, 898 F.2d 293, 296 (2d Cir. 1990) (quoting Rivera v. Schweiker, 717 F.2d 719, 723 (2d Cir. 1983)); accord Malarkey v. Astrue, No. 08 Civ. 9049, 2009 WL

3398718, at *10 (S.D.N.Y. Oct. 20, 2009).

    B. <u>Application of the Five-Step Analysis</u>

    In making her determination that Mr. Johnson was not disabled, ALJ Edgell performed the five-step analysis required by law. (A. at 13-14). She properly evaluated evidence of the plaintiff's condition, including his medical records, functional assessment by his physicians, and his own testimony regarding his symptoms. (A. at 14-18). Thus, ALJ Edgell applied the "proper legal standard" in reaching her conclusion that Mr. Johnson is not disabled.

    Mr. Johnson alleges that the ALJ erred because: (1) she did not consider his impairments in combination and that she failed to fully explain her conclusions about the level of severity of his impairments; (2) she did not properly apply the treating physician rule, substituted her own judgment for that of Mr. Johnson's treating sources, and relied on her own speculation about the medical evidence; (3) she did not correctly apply the Commissioner's regulations to determine Mr. Johnson's credibility; (4) she did not supply a "function by function" assessment of the plaintiff's impairments when she determined his residual functional capacity; and (5) she should have employed a vocational expert, rather than relying solely on the grids to determine the availability of suitable work. (Compl., ¶¶ 10-11). I will address each of these arguments in turn.

    1. <u>Combination of Impairments</u>

    Mr. Johnson asserts that ALJ Edgell did not explain why his impairments, in combination, do not meet or equal a listed

26

impairment.   However,  an  ALJ  may  "rely  not  only  on  what  the
[medical]  record  says,  but  also  on  what  it  does  not  say."  Dumas  v.
Schweiker,  712  F.2d  1545,  1553  (2d  Cir.  1983).   At  step  two,  the
ALJ  explained  that  she  could  not  conclude  that  Mr.  Johnson's
impairments  equaled  a  listed  impairment  because  requisite  medical
findings  were  absent  from  the  record.   Thus,  ALJ  Edgell's
conclusion  was  correctly  based  on  the  absence  of  threshold  findings
in  the  plaintiff's  medical  files.

In  order  to  assess  residual  functional  capacity,  the  ALJ  is
required  to  consider  all  relevant  evidence  of  exertional  and
nonexertional  impairments,  including  all  symptoms  and  any  medical
opinions.   20  C.F.R.  §§  404.1527,  404.1545.   However,  the
regulations  also  stipulate  that  "[m]edical  impairments  and
symptoms,  including  pain,  are  not  intrinsically  exertional  or
nonexertional.   It  is  the  functional  limitations  or  restrictions
caused  by  medical  impairments  and  their  related  symptoms  that  are
categorized  as  exertional  or  nonexertional."   SSR  96-8p,  1996  WL
374184,  at  *1.   Therefore,  the  ALJ  must  determine  the  extent  of  a
claimant's  limitations  due  to  impairments  along  with  whether
symptoms  can  be  accepted  as  consistent  with  objective  medical
evidence  and  other  evidence.[13]   20  C.F.R.  §  404.1529.

_____

[13]   "Objective  medical  evidence"  is  medical  "signs  and
laboratory  findings"  as  defined  in  20  C.F.R.  §  404.1528(b)  and  (c).
20  C.F.R.  §  404.1529(a).   "Other  medical  evidence"  is  defined  in  20
C.F.R.  §§  404.1512(b)(2)-(8)  and  404.1513(b)(1),  (4),  (5)  and  (d).
20  C.F.R.  §  404.1529(a).   Together,  they  include  statements  or
reports  from  the  claimant,  his  treating  sources,  or  others  about
the  claimant's  "medical  history,  diagnosis,  prescribed  treatment,
daily  activities,  efforts  to  work,  and  any  other  evidence  showing
how  [the  claimant's]  impairment(s)  and  any  related  symptoms  affect

ALJ Edgell implicitly considered all of Mr. Johnson's impairments when she deferred to the expertise of his examining physicians and accepted their opinions. (A. at 17). In addition, she also specifically analyzed the impact of his pain on his residual functional capacity and considered whether his depression was severe enough to constitute an independently significant factor. (A. at 15-17). Thus, the ALJ properly took into account the impact of Mr. Johnson's exertional and nonexertional impairments in her conclusion that he has the residual functional capacity to perform a range of light work.

In her analysis of the plaintiff's residual functional capacity, ALJ Edgell explicitly addressed Mr. Johnson's pain. First, she discussed the medical records that supported his claims regarding pain, including MRI, EMG, emergency room, and physician visit reports. (A. at 15-16). Second, she compared the extent to which the functional assessment forms reflected limitations to his ability to work as expressed in the medical record. (A. at 17).

Next, while ALJ Edgell did not explicitly discuss Mr. Johnson's obesity, his weight was implicitly considered in all of the medical evaluations she used to reach her conclusion about his residual functional capacity. While Dr. Fernando refers to Mr. Johnson's weight in his treatment notes, Dr. Scheinfeld and Ms. O'Brien never suggest that obesity is an independent consideration. Furthermore, Mr. Johnson's weight is not reported in treatment notes or the functional assessment forms to limit his range of

_____

[his] ability to work." 20 C.F.R. § 404.1529(a).

motion, strength, reflexes, or gait.

Finally, ALJ Edgell discussed the nature of Mr. Johnson's depression as a disabling factor at step one and concluded that it was not severe enough to weigh in her analysis of his impairment. The ALJ explained her reasoning by noting that there was no evidence in the record that the plaintiff sought treatment prior to August 2008, and that a September 17, 2008 report stated Mr. Johnson was "feeling much better." (A. at 15). Thus, she determined that Mr. Johnson did not have "depressive manifestations that either lasted or could be expected to last for a continuous 12 month period." (A. at 15).

To be sure, ALJ Edgell inaccurately characterized the record as it pertains to Mr. Johnson's psychiatric state. While it is true that Mr. Johnson did not seek treatment for depression and anxiety prior to August 2008, he did begin to report depression to Dr. Scheinfeld and Ms. O'Brien beginning in March of 2006. (A. at 160-61). In addition, the handwriting on the psychiatric evaluation sheet that ALJ Edgell refers to is nearly illegible, and although she construed it to read Mr. Johnson was "feeling much better" as of his last visit, the report gives the overall impression that he continued to experience depression, stress, and anxiety. (A. at 348). "No change" had occurred in his functioning or long or short term goals of controlling depression and anxiety. (A. at 348). Nevertheless, none of the psychiatric and medical reports indicate a mental disorder severe enough to warrant additional psychiatric tests that could have generated the

necessary particularized findings under the regulations.  Thus, although ALJ Edgell is incorrect that Mr. Johnson had did not experience depression and anxiety for the required duration, she adequately considered his psychiatric issues in her analysis.

## 2. <u>Treating Physician Rule</u>

Next, Mr. Johnson alleges that the ALJ did not properly apply the treating physician rule, substituted her own judgment for that of the treating sources, and relied on speculation about the medical evidence.  A treating physician's report is to be given more weight than other reports and will be controlling if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  However, opinions related to "dispositive" issues, such as whether a claimant "meet[s] the statutory definition of disability," are reserved for the Commissioner.  20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).  Under 20 C.F.R. § 404.1527, not only may the reports of consultative or non-examining physicians constitute substantial evidence as to disability, but they may even override the opinions of treating physicians.  20 C.F.R. § 404.1527(d); see Snell v. Apfel, 177 F.3d 128, 132-33 (2d Cir. 1999); Cruz v. Barnhart, No. 04 Civ. 9011, 2006 WL 1228581, at *11-14 (S.D.N.Y. May 8, 2006) (consultative examinations given controlling weight over treating physician's opinion that was not consistent with medical record, claimant's daily activities, or opinions of other physicians); Punch v.

Barnhart, No. 01 Civ. 3355, 2002 WL 1033543, at *12 (S.D.N.Y. May 21, 2002) (noting that "the report of a consultative physician can constitute substantial evidence" in overriding opinion of treating physician).

However, if an ALJ determines that a treating physician's opinion is not controlling, she is required to consider certain factors in determining the weight to be given to that opinion. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). These factors include: (1) the length and frequency of the treatment relationship, (2) the nature and extent of the relationship, (3) the degree of evidence provided to support the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) whether the physician is a specialist, and (6) other factors brought to the Commissioner's attention tending to support or contradict the treating physician's opinion. 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6); Halloran, 362 F.3d at 32. The Commissioner must provide "good reasons" for the weight given to a treating physician's opinion, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), and failure to do so may result in remand of the case. See Halloran, 362 F.3d at 32-33.

Here, contrary to Mr. Johnson's assertions, ALJ Edgell did give appropriate weight to the treating source opinions. First, the ALJ considered all of the reports and tests spanning the entire duration of Mr. Johnson's treatment at CRSM. (A. at 15-17). Therefore, she also accounted for the nature and extent of Mr. Johnson's relationship with Dr. Scheinfeld and Ms. O'Brien.

Moreover, the ALJ evaluated the degree to which medical evidence supported Dr. Scheinfeld's opinions about Mr. Johnson's capacity for work. (A. at 17). In fact, treating source opinions and corollary medical records do not support finding Mr. Johnson disabled: Dr. Scheinfeld's last functional assessment expressed the opinion that Mr. Johnson was capable of performing tasks consistent with light work, and his first assessment indicated that the plaintiff was capable of at least sedentary work. (A. at 267-70, 356-59). In addition, the ALJ apparently gave Dr. Scheinfeld's functional assessment more weight than that of Dr. Fernando, whose findings would have justified a conclusion that Mr. Johnson could perform more than light work. In any event, Dr. Scheinfeld is not a specialist whose treatment notes deserve special regard on the basis of superior expertise.

ALJ Edgell provided persuasive reasons for rejecting aspects of treating source opinions when she did so. For example, she discounted Dr. Scheinfeld's opinion that Mr. Johnson could "never" stoop or crouch and his estimate that the plaintiff could stand or walk for no more than two hours out of a workday because Dr. Scheinfeld's own long-term records showed that Mr. Johnson consistently had a normal gait and full range of motion. (A. at 17). The ALJ also found that Mr. Johnson's own description of his activities undermined Dr. Scheinfeld's assessment, pointing to the fact that the plaintiff had sustained an injury "from his involvement with working on a lawn mower, . . . [an activity] not consistent with the degree of limitations reported by Dr.

Scheinfeld." (A. at 17). The ALJ also did not give weight to certain aspects of Dr. Fernando's opinion. She set aside his concern that Mr. Johnson might have suffered his original injury after losing consciousness on the roof, because no other evidence in the record suggested he had actually passed out. (A. at 17). Overall, ALJ properly applied the treating physician rule and considered the medical evidence.

### 3. Function by Function Analysis

Mr. Johnson asserts that ALJ Edgell did not undertake a function-by-function analysis of his abilities and that her explanation of her decision was conclusory. A residual functional capacity assessment "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." SSR 96-8p, 1996 WL 374184, at *1. However, "[a]t least two circuit courts of appeals have concluded that '[a]lthough a function-by-function analysis is desirable, the ALJ need not discuss each factor in his written opinion.'" Dillingham v. Astrue, No. 09-CV-236, 2010 WL 3909630, at *11 (N.D.N.Y. Aug. 24, 2010) (second alteration in original) (quoting Delgado v. Commissioner of Social Security, 30 Fed. Appx. 542, 547-48 (6th Cir. 2002)), report and recommendation adopted by 2010 WL 3893906 (N.D.N.Y. Sept. 30, 2010); see also Bencivengo v. Apfel, No. C.A. 99-6135, 2000 WL 875684, at *3 (E.D. Pa. June 14, 2000), aff'd Bencivengo v. Commissioner of Social Security, 251 F.3d 153 (3d Cir. 2000); Casino-Ortiz v. Astrue, No. 06 Civ. 155, 2007 WL 2745704, at *13 (S.D.N.Y. Sept. 21, 2007),

<u>report and recommendation adopted by</u> 2008 WL 461375 (S.D.N.Y. Feb. 20, 2008). Rather, "an ALJ must explain how the evidence supports his or her conclusions about the claimant's limitations and must discuss the claimant's ability to perform sustained work activities." <u>Casino-Ortiz</u>, 2007 WL 2745704, at *13 (internal quotation marks and citation omitted).

Here, the ALJ discussed the content of Mr. Johnson's medical records over a three-year period, three functional assessment reports, MRI and EMG results, psychological evaluations, and the plaintiff's testimony, all of which reflect upon his ability to perform work-related functions. (A. at 15-17). ALJ Edgell found that the evidence demonstrated that Mr. Johnson could perform "at least low levels of work related activities on a sustained basis," that could include lifting lighter objects, "such as those weighing up to twenty pounds." (A. at 16-17). In addition, she found that the evidence showed that Mr. Johnson could sit, stand, and walk throughout the day, and that "the normal work breaks and lunch period indigenous to substantial gainful activity would afford [him] opportuni[ties] to change position or rest should any such need arise as the result of his impairments." (A. at 17). Thus, ALJ Edgell employed a process which took into consideration those factors essential to a function-by-function analysis, and she adequately explained her reasoning.

4. Credibility

Mr. Johnson next alleges that ALJ Edgell did not evaluate his credibility properly when she discounted his subjective complaints

34

of pain and weakness.  (Compl., ¶ 11(d)).  Further, he asserts she improperly failed to accord his work history weight in making her credibility determination.  (Pl. Memo. at 19-21).  The Commissioner's regulations set forth a two-step process for evaluating a claimant's testimony regarding his symptoms.[14]  "First, the ALJ must consider whether the claimant has a medically determinable impairment which could reasonably be expected to produce the pain or symptoms alleged by the claimant."  Murphy v. Barnhart, No. 00 Civ. 9621, 2003 WL 470572, at *10 (S.D.N.Y. Jan. 21, 2003).  If such an impairment exists, the ALJ must then "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms."  Id. (internal quotation marks and citation omitted).  The ALJ should "consider all of [the claimant's] symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  20 C.F.R. § 404.1529(a).  Objective medical evidence is a "useful indicator" of the intensity, persistence, and effect of a claimant's symptoms, but a claimant's statements about his symptoms may not be rejected solely because they are not substantiated by objective medical evidence.[15]  20 C.F.R. § 404.1529(c)(2).  Thus, "[i]f the claimant's statements

---

[14] "Symptoms" are the claimant's own description of his or her physical or mental impairments.  20 C.F.R. § 404.1528(a).

[15] "Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption."  20 C.F.R. § 404.1529(c)(2).

about her symptoms are not substantiated . . ., the ALJ must make a finding as to the claimant's credibility" and give specific reasons for the weight accorded to the claimant's testimony. Murphy, 2003 WL 470572, at *10; see also Lugo v. Apfel, 20 F. Supp. 2d 662, 663 (S.D.N.Y. 1998). "A claimant with a good work record is entitled to substantial credibility when claiming an inability to work . . . [although w]ork history [] is but one of many factors to be utilized . . . ." Marine v. Barnhart, No. 00 Civ. 9392, 2003 WL 22434094, at *4 (S.D.N.Y. Oct. 24, 2003). A reviewing court must defer to an ALJ's finding regarding a claimant's credibility when it is supported by substantial evidence. Osorio v. Barnhart, No. 04 Civ. 7515, 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006) (citing Aponte v. Secretary of Health and Human Services, 728 F.2d 588, 591 (2d Cir. 1984)).

Here, the ALJ was within her authority to discount Mr. Johnson's subjective complaints of disabling pain and weakness. First, the ALJ acknowledged that Mr. Johnson's medical records showed disc herniation and disc bulging in his back, along with nerve damage in his leg with some diminished strength and sensation, which might be expected to cause his purported symptoms. (A. at 15). Next, the ALJ noted that even though an EMG revealed femoral neuropathy, Mr. Johnson only suffered "scant dennervation," after which he reported that he was "not doing so bad" and retained the ability to walk with a normal gait. (A. at 16). Furthermore, ALJ Edgell discussed the fact that the x-ray and MRI tests revealed no spinal stenosis, spinal cord compression, or actual nerve root

compromise.  (A. at 16).  Third, she cited two indicia that Mr. Johnson's reported symptoms were not entirely credible: first, that his pain seemed to improve over time; and second, that he had never sought emergency or hospital treatment for his pain.  (A. at 16). Fourth, the ALJ noted that Dr. Fernando observed Mr. Johnson maneuver onto and off of the examination table and rise from a seated position, despite his leg and back ailments.  (A. at 16). Finally, the ALJ noted that, according to his own testimony, Mr. Johnson was capable of participating in activities inconsistent with his characterization of the severity of his symptoms.  (A. at 16).  Thus, the ALJ's conclusion that Mr. Johnson's account of his symptoms was less than credible is entitled to deference because it is supported by substantial evidence.

Here, Mr. Johnson's work history is but one of many considerations that went into the ALJ's analysis of his credibility.  Although it is true that the plaintiff has an extensive work history, the ALJ apparently considered other evidence in the record more relevant to her assessment, such as the medical findings and the plaintiff's activities of daily living, that did not tend to substantiate his complaints of debilitating pain.

### 5. Medical-Vocational Guidelines

Finally, Mr. Johnson argues that the ALJ did not meet her burden of proof at the fifth step of the analysis because she relied solely on the grids and did solicit testimony from a vocational expert.  (Compl., ¶ 11(f)).  The plaintiff asserts that

reliance on the grids alone is impermissible when nonexertional impairments are present.  (Pl. Memo. at 23-24).  However, the ALJ had already determined the impact of Mr. Johnson's exertional and nonexertional impairments on his residual functioning capacity and had concluded that his nonexertional impairments did not present significant limitations.  (A. at 15-17).  Moreover, the only nonexertional limitation noted on the functional assessment forms was the need to work in an environment free from hazards and vibration, unrelated to his pain or depression.  (A. at 270, 359).  Thus, ALJ Edgell's reliance on the grids was proper.

### C. Substantial Evidence

Despite the fact that ALJ Edgell's description of Mr. Johnson's level of functioning was inaccurate in some respects, there is enough evidence to substantiate her overall assessment of Mr. Johnson's status.  While the ALJ stated that Mr. Johnson regularly drove himself to his physical therapy sessions when in fact he testified that his wife drove him, he did state that he could drive short distances.  (A. at 16, 401, 422).  Similarly, the fact that Mr. Johnson actually said he attended church once a month rather than once a week, as the ALJ asserted in her opinion, does not seriously undercut her conclusion as to his functional capacity.  (A. at 16, 404).  Moreover, although she perhaps overstated the extent to which Mr. Johnson regularly rode a stationary bike for exercise, he did ride a stationary bike at his physical therapy sessions over a sustained period of time.  (A. at

16, 150-51, 153-55, 164, 168, 170, 172, 174, 176, 236, 238, 240, 242).

Despite the ALJ's reliance on the illegible handwriting on the psychiatric report describing Mr. Johnson as "feeling much better," the psychiatric reports consistently note that Mr. Johnson is capable of performing activities of daily living and do not suggest that Mr. Johnson was severely affected by his psychological problems.  (A. at 348-54).  Furthermore, Mr. Johnson himself attested that medication "helps."  (A. at 431).

Finally, Mr. Johnson received the benefit of a generous reading of other facts in the record.  The ALJ accepted Mr. Johnson's assertions that he did not actually earn the otherwise disqualifying income reported he reported to the IRS in 2006. (A. at 14).  ALJ Edgell also did not discuss Dr. Oppenheim's opinion, which undermines Mr. Johnson's claims of debilitating pain.

The totality of the record supports the conclusion that even with his impairments, Mr. Johnson is capable of performing sedentary work.  At a minimum, he can frequently sit and occasionally lift or carry objects weighing no more than ten pounds at a time, as required by sedentary work under 20 C.F.R. § 404.1567(a), and he is likely capable of a higher level of activity.  Thus, even if the ALJ overstated Mr. Johnson's capability to some extent, the Court must defer to her decision because the conclusion that Mr. Johnson is not disabled is supported by substantial evidence.

Conclusion

Substantial evidence in the record supports that Mr. Johnson is capable of, at a minimum, sedentary work and is not disabled. I therefore recommend that Mr. Johnson's motion be denied, the Commissioner's motion be granted, and judgment be entered in favor of the Commissioner. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Richard M. Berman, Room 650, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

SO ORDERED.

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:   New York, New York
         December 3, 2010

Copies mailed this date to:

Irwin M. Portnoy, Esq.
Irwin M. Portnoy and Associates, PC
542 Union Avenue
New Windsor, New York 12553

Susan C. Branagan, Esq.
Assistant United States Attorney
86 Chambers Street - 3rd Floor
New York, New York 10007